## MacKay and others *v*. Jackman.

### Same *v*. Scott Sole Sewing-Machine Co. and others.

### Same *v*. Lehman and others.

*(Circuit Court, S. D. New York.   April 15, 1882.)*

PATENTS FOR INVENTIONS.
    A mere process for making an article is not of itself a patentable invention.

*Elias Merriam* and *J. J. Storrow*, for orator.
*J. C. Clayton*, for defendants.

WHEELER, D. J.   These suits are brought upon two patents originally granted to Lyman R. Blake, dated August 14, 1860,—one, No. 29,561, for an improvement in the construction of boots and shoes; and the other, No. 29,562, for an improvement in boots and shoes. These were to run 14 years, and August 13, 1874, were extended seven years.   They were acquired by the orator, and the former was reissued in No. 9,043, dated January 13, 1880, and both have expired since these suits were brought.

Before Blake's inventions boots and shoes were made by pegging through the outer sole, upper, and inner sole, by sewing a welt to the inner sole and upper, and then sewing the outer sole to the welt. Some very light shoes were made wrong side out by sewing through the inner sole, upper, and part way through the outer sole, and then turned, and some very low shoes were made by sewing common stitches directly through the inner sole, upper, and outer sole.   Sewing parts of uppers and pieces of leather and cloth for other purposes together by chain-stitches made by machine, by drawing loops of the thread through the material, without drawing the rest of the thread through, was then known and practiced; but no boots or shoes made by sewing the soles and upper together by such stitches, nor any method of so sewing them together, was then known.   No means to which that place was accessible for setting the stitches had then been discovered.

Blake invented an improvement in sewing-machines by which the soles and uppers of all kinds of boots or shoes could be sewed together without any welt by that kind of stitches, and it was not useful for, nor adapted to, sewing any other kind of stitches, nor in any other place. This improvement was patented to him in letters patent No. 20,775, dated July 6, 1858, and was highly useful to the public. He made boots and shoes on his machine, and was undoubtedly the first to produce such boots or shoes, or to practice that mode of making them. He made application for a patent for this process of making boots and shoes, and for the boots and shoes made by this process, as a new manufacture, June 30, 1859. The specification was returned to him for the erasure of one of the claims, with information that claims for the process and product could not be considered in the same application, July 30, 1859. He withdrew the claim for the product, with notice that he intended to renew it in a separate application, April 16, 1860, and did renew it July 21, 1860. The machine patent was granted for 14 years, was extended seven years, was owned by the orator, and expired July 6, 1879. The defendant Jackman took a lease from the orator of a sewing-machine, with the right to use it under all three of the patents during the term of either for license fees for all boots and shoes made upon it and operated under that license. Since the expiration of the machine patent the defendant the Scott Sole Sewing-Machine Company has made machines for sewing these boots and shoes by this method, and sold them for use to the defendants in the other cases, who have used them. These bills are brought for relief against these acts as alleged infringement; and in the case against Jackman the bill covers any arrears of license fee there may be for the use of the machine, as this court has jurisdiction of that subject on account of the citizenship of the parties. No question as to that, however, is made for decision.

The machine patent appears to have always been of unquestioned validity. That was so related to the others that any question as to their validity would have been practically unavailing while that was in force, and no question appears to have been really made and contested about either until after that had expired, and the actual validity of these two patents as granted does not appear to have ever been contested until now.

In *McKay* v. *Dibert*, 19 O. G. 1351, these patents were in controversy. The infringement complained of appears to have been the use of a machine after the expiration of the machine patent. It seems to have been argued there that as the exclusive right to make

and use, and vend to others to be used, during the term of the patent had been granted in consideration of the full right which the public should have to the invention after the expiration of the term, the public would have the full right to the machine after that time, notwithstanding the other patents, and that they would practically be cut down to the life of the machine patent by the expiration of that. The court (Judge Nixon) appears to have held that the expiration of the machine patent left the machine free to all, except for use to infringe other patents with, but that its expiration could not affect the validity of other patents. That case is cited in the orator's brief at page 16, and this is all that is claimed from it. The same point was made upon the hearing on the motion for preliminary injunction in these cases, and was disposed of orally by Judge Blatchford upon the authority of that case. The question was also made whether a mere sale of the machine for use in making such boots and shoes would be an infringement, and it was held that it would be, and injunctions were granted. These questions appear to have been all that were then decided. A stenographic report of the proceedings upon that motion has been furnished and examined, and the question as to the validity of these patents when granted does not appear to have been considered. Both of these decisions, too, were made before those of the supreme court in *Miller* v. *Bridgeport Brass Co.* 21 O. G. 201, and in *James* v. *Campbell,* Id. 337. So the questions as to the validity of these patents as made in these cases are now to be passed upon.

The first step is to ascertain exactly what Blake did invent. There are many peculiar and valuable qualities of this kind of stitch when used to bind together the surfaces of leather. Only the loops of the stitches are drawn through as made, and the wax is not scraped off and the thread frayed and worn as is the case when each stitch is set by drawing the whole length of the thread through from the ends. Each loop as drawn to place tightens the preceding loop and makes the seam very close. And they can be sewed by machine and drawn tighter than by hand, making the binding together of the surface of the leather very firm. These qualities are very useful in the sewing together of the soles and uppers of boots and shoes, but none of them are peculiar to that work or to the work in that place. The same qualities existed in this kind of sewing as used in uniting parts of uppers and elsewhere, and he had the advantage of knowing all about them. Had it been desirable to sew seams like those through soles and uppers in boots and shoes where the uppers would not have been

in the way, it would have required no invention whatever to do it with the machines then in use and with this kind of stitch; or had it been desirable to so sew any seams, it would have required no invention to take these stitches for them. The fitness of the seams was apparent, but the uppers were in the way of employing them. Blake invented means for getting by the uppers and sewing the seams there notwithstanding the uppers. He used his means to sew the seams there and accomplished a great thing; but not because he had made a new kind of seam or given a seam any new quality, but because he had put a well-known seam in a difficult place. This was all due to the machine and its operation, and when he had patented the machine he had patented all there was of it. If, after he had made his machine, and before he had made a boot or shoe with it, some one else, knowing all about it, had, by hand or other known means, made boots or shoes by sewing the soles and uppers together with this stitch, that other person would not have been entitled to a patent for either the process of sewing, or the boot or shoe, for there would have been no invention in either. After knowledge of a machine to make a shoe in a particular manner there would be no room for an invention of that manner of making a shoe, or of a shoe made in that manner, and there would be no more room for the inventor of the machine than for any one else. It may be doubtful whether such a process or product as these is by itself patentable.

Mr. Justice Grier, in delivering the opinion of the court in *Corning* v. *Burden*, 15 How. 252, said:

"A process *eo nomine* is not made the subject of a patent in our act of congress. It is included under the general term 'useful art.' An act may require one or more processes or machines in order to produce a certain result or manufacture. The term 'machine' includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result; but when the result or effect is produced by chemical action, by the operation or application of some element or power of nature, or of one substance to another, such modes, methods, or operations are called 'processes.' A new process is usually the result of discovery—a machine of invention."

In *Cochrane* v. *Deener*, 94 U. S. 780, Mr. Justice Bradley said: "A process is a mode of treatment of certain materials to produce a given result. It is an act or a series of acts performed upon the subject-matter to be transformed and reduced to a different state or thing."

This language of Mr. Justice Grier, with more to the same import, was quoted with approval by Mr. Justice Bradley in *Tilghman* v. *Proctor*, 102 U. S. 707. Neither of these definitions includes mere mechan-

ical operations like the looping and drawing thread to form stitches in sewing, either by machinery or by hand; and such operations, apart from the means for performing them, do not appear to be within the reach of protection by the patent laws. *O'Reily* v. *Morse*, 15 How. 62; *Howe* v. *Morton*, Curtis, Pats. 269; *Burr* v. *Duryee*, 1 Wall. 570. There is, of course, no doubt but that a boot or shoe might be the subject of a patent as an article of manufacture, but there would have to be something new about it as such in the sense of the patent laws. Blake did not invent a boot or shoe, nor a sewed boot or shoe, nor a boot or shoe sewed with this kind of stitches. All those were known and in use before. He invented a machine by which boots and shoes could be sewed with this kind of stitches in parts where they could not be so sewed before. The new effect was due to the operation of the machine. The patentability belonged to the machine, and not to the boot or shoe, as appeared before.

In *Collar Co.* v. *Van Dusen*, 23 Wall. 530, Mr. Justice Clifford, on this subject, said:

"Articles of manufacture may be new in the commercial sense when they are not new in the sense of the patent law. New articles of commerce are not patentable as new manufactures, unless it appears in the given case that the production of the new article involved the exercise of invention or discovery beyond what was necessary to construct the apparatus for its manufacture or production."

In this case that requisite does not appear.

Further, this machine, the process it went through with, and the work it wrought were so intimately connected that the machine could not be conceived of as an operative thing without involving the rest. The specification of the machine and its use in the machine patent included also a description of the process and product. This is shown by the patent itself, and is proved also by the testimony of experts examined as witnesses. It also appears to have been the view taken by Judge Nixon in *McKay* v. *Dibert*, where he suggests that a surrender and reissue of this patent in divisions would have avoided the incongruity arising from the expiration of the patents at different times.

In *Miller* v. *Bridgeport Brass Co.* it is strongly intimated that whatever a patentee describes in the patent and does not claim is abandoned to the public, unless it was omitted to be claimed by inadvertence or mistake, and a correction is sought immediately upon discovery of the omission. There is an allusion to the statute for defeating a patent by two years' public use and being on sale of the

invention, as an illustration or reason; but the case does not seem to hold that two years are to be allowed in which to reclaim what is so described.

In *James* v. *Campbell* Norton had taken out a patent December 16, 1862, for a post-marking and postage-cancelling stamp containing a combination of the post-marker and blotter and cross-bar connecting them, the blotter to be made of steel or other material which would answer its purpose, and to have on its face circular cutters enclosed in circular rings to cut the postage stamp at the time of defacing it with ink. The specification described and the drawing showed the whole. The claims were for the cancelling stamp separately, and for the combination of the cancelling stamp with the cross-bar. On the fifth day of January, 1863, 20 days after, he made application for a patent for post-marking and postage-cancelling stamp of the same construction as the other, except that the blotter was to be made of wood, cork, rubber, or similar material held by a tube fastened at one end of the cross-bar. The claims were for the blotter separately, and for the blotter in combination with the cross-bar and post-marking device. This patent was granted. It was several times reissued, but the validity of it as originally granted came under consideration, and especially the claim for the combination. This combination was not the same as that patented in the former patent in any sense. That was a combination of a blotter with a cross-bar only, while this was a combination of a different blotter with a cross-bar and post-marker. The whole of this combination was described in the former patent, except the difference in the blotter of these patents.

Mr. Justice Bradley said:

"It is hardly necessary to remark that the patentee could not include in a subsequent patent any invention embraced or described in a prior one granted to himself any more than he could an invention embraced or described in a prior patent granted to a third person. Indeed, not so well; because he might get a patent for an invention before patented to a third person in this country if he could show that he was the first and original inventor, and if he should have an interference declared. Now, a mere inspection of the patents referred to above will show that after December, 1862, Norton could not lawfully claim to have a patent for the general process of stamping letters with a post-mark and cancelling stamp at the same time, nor for the general combination of a post-stamper and blotter in one instrument, nor for the combination of a post-stamper and blotter connected by a cross-bar, for all these things, in in one or other specific form, were exhibited in these prior patents."

The original patent was declared to have been invalid upon this ground.

As before shown, Blake's machine patent exhibited both the shoe of his product patent and mode of construction of his process patent, to which he was no more lawfully entitled than Norton was to his second patent for what was exhibited in the first. It is conceded in defendants' brief that there should be a decree for an account of license fees against Jackman.

Let decree be entered for an account of license fees in the case against Jackman, and dismissing the bill as to the residue, and dismissing the bills, with costs, in the other cases.